Life Insurance Company  Our next case is number 17-11165, Charles O'Brien v. Transamerica Life Insurance Company. Take your time. Take your time. Make sure you use them whenever you're ready. Make sure you use them whenever you're ready. I didn't see anything in the record and I may have just missed it. Is there anything in there about when the rider was issued in relation to the initial annuity contract? Is there anything in the record? The rider itself doesn't have a date on it, unlike the annuity contract. Is there anything to indicate when that was done in comparison to the annuity contract that was purchased? Only the fact that it's attached to the annuity contract. Is there anything in the record to indicate whether or not there was any separate consideration for the rider? Yes, Your Honor, as the court's question has, there is some. What you have to look at here is, if you look at the record specifically, there are no annual statements. The annual statements would have been provided by Vanguard to the O'Briens. On those annual statements, it's supposed to have listed all maintenance fees and things like that. I'm not an expert on annuities, so I probably shouldn't say too much, but if you amend a policy that has a long-term coverage, and you amend it in a way that is beneficial toward the policyholder, you are going to generally pay something for that extra coverage or extra protection. I'm trying to find out if there's anything in the record about whether or not here the annuitants paid anything over and above the initial premium to Transamerica's predecessor. Well, I think you'd have to look at how the fee was assessed. It says in the contract that the fee is assessed for a period of 10 years from the contract date, which is defined in the date of the issuance of the contract. That's on document 48.2, page IV-430. Whether the contract's in payout or not, it doesn't have any limitation. I know that's a different question. I just want to find out. I'm trying to find out the relationship between the writer and the policy itself. Was it issued at the same time? Was there any separate consideration? Was it a separate transaction? Was it all part of the same? Sometimes insurance companies, because of the way they operate, issue riders contemporaneously with a policy, and that's just part of the policy, but you're not paying anything separate for it, right? I'm trying to find out if that's what happened here or not. That doesn't solve the questions we have. I just want to get it in my head correct whether or not this was done after the fact or at the time. But you seem to be indicating that we really don't have anything in the record. We don't have anything in the record, but it appears to be contemporaneous. I thought it was in the record that the contract and the rider were executed simultaneously. Are you saying that's not in the record? Because when I looked at the record, that's what I thought it said. That's what I believe happened, Your Honor, is it happened contemporaneously. But is it in the record or is it not in the record? There's no separate, as Judge Jordan pointed out, there's no date on the rider. I understand, but is it in the record that they were executed simultaneously or is it your position that it is not in the record? Well, I think that what you might want to look at is you might want to look at the contract. Can you answer the question, though? Yes, I think it is there, and I think if you look at the contract in Vanguard, there was an election there for that rider. Right, so it is in the record that they were issued simultaneously, right? Okay, that being the case, isn't it also the case as the Sixth Circuit has determined Ohio law that if the rider is expressly incorporated into the contract, there is no need for consideration? I would accept that, but the rider doesn't say that. The rider says there's an additional mortality charge. Well, doesn't the rider actually say that it's attached to the contract? Yes, it's made a permanent part of your contract. Well, doesn't that mean it's incorporated into the contract? Yes, and then it says there will be an additional charge assessed. So there is separate consideration. What was the separate charge, which was my initial question? Was there separate consideration? .0125% charged quarterly on the contract anniversary date. But there's nothing that it substitutes for in the contract. No, it doesn't have to. It's an extra thing. It doesn't define the term. To me, it's like you buy a cup of coffee, and then you've got to pay extra for the drink. That's what's going on here. Except that here, there's no prior coffee. The new term that's in the rider is not a term that's in the contract. Correct. It's not defined either. What does it mean? It means what it says. That doesn't help me, frankly. It says that there's an additional charge. Was that charge imposed? Yes. You said there were no statements. There's no statements in the record. How do you know the charge was imposed? Because it says all throughout the contract how the fee is supposed to be imposed. And I don't know, but I'm pretty sure that since they have control of the pile of money, they have the ability to extract those funds out of the subaccount and pay these maintenance fees. And that would be a presumption of regularity that I believe shows this was paid. What does it matter then if that's the case? What does it matter if there was additional consideration, if she elected the annuity version of this contract to be paid out over a lifetime with a minimum of 10 years? What does it matter what they're charging her? As long as she lives the 10 years, the charge doesn't matter, right? The charge goes on for 10 years. But it doesn't matter because she's getting a guaranteed stream of income for a lifetime, a minimum of 10. So maybe I guess you could argue that if she didn't live 10 years, then whatever her heirs would get would be reduced by the charge and there would be loss. But if she lives beyond the 10, she keeps getting that income stream, and at that point it doesn't really matter what the charge was. They could have been charging her $50,000 a week. It wouldn't have mattered because she would have been getting the same guaranteed income stream even if the policy value had fallen way below, right? In that circumstance, how are you entitled to recover the lump sum left over? You're conflating the annuity with the death benefit, which goes to the beneficiary. But you don't get both. Without the rider, you didn't get both, right? That's correct. There's no rider. You're not going to get a death benefit if she lived beyond the terms of the contract. But the rider doesn't talk about when the annuitant dies. No, it doesn't. So why don't you read that in conjunction with the contract, which says you only get the death benefit if the annuitant dies before the annuity date is completed, the 10-year period is completed. But it's silent on when the annuitant dies. Even if it replaces, it doesn't tell you whether it's before or after. And if it's silent, why don't you read it consistent with the contract to make it all work? Because what happens is if you compare and contrast the death benefit prior to the annuity date with the return of premium death benefit, what you have is you get in both instances, you get either the accumulated value of the contract, or the sum of all premium payments less the enumerated charge. You also get an annuity payment. Well, if you went into the return of death benefit premium, you would still get your annuity payment. But we believe that what the return of death benefit does is eliminate the requirement that the death occur prior to the annuity date. So you get to double-dip. No one's double-dipping, Your Honor. Sure you are. This is an annuity, and this is like a life insurance. No, no, come on. How much were her annuity payments over the 10-year period per month? I think they ranged, they were $14,000 to $15,000. Per month? Okay. How much did she get paid over the course of her lifetime from the time the annuity payments began? A lot. More money than she put in. And so now you are double-dipping. No. Because you – let me tell you my theory, and you can tell me why I'm wrong. She pays in X amount of money, right? Over the course of a lifetime, she gets X-plus amount of money, right? So she's already getting more than she paid in. And now when she passes away, you're saying, by the way, she gets X again. That's not double-dipping to you? No, and I'll tell you why. Okay. In my position, what happens is the payable annuity, the investments are directed by the person who bought the annuity. They decide the allocation. The annuity can go up or down depending on the perspective of the investor. So the money rises and falls. The accumulated value of the contract rises and falls during that entire frame. The time frame, because the accumulated value of the contract is what the insurance company sets – or what Vanguard has set aside to make the payment. With that said, what you have is you have a situation where the insurance company is taking charges yearly, even after the payment, for the maintenance cost. The insurance company is making the cost. They're getting all their little charges and all their other stuff, and it's basically like a bag getting in. Somebody getting in. They're getting their cut. Right, so everybody got a little bit of what they wanted. Your client got more than she paid in, and the insurance company made some profit off of it. My client is not the annuity. My client is Mr. O'Brien. No, no, your client today was not the annuitant. The annuitant was Ms. O'Brien. She got everything she paid for, right? Okay. But you – and what is the value that you think he is entitled to now? That's the accumulated value of the contract, which is around $950,000, which is the total amount he's asking for. Initial investment, over time, all the payments, the rest of the payments, and the accumulated value of the contract, which he's asking for. Okay. All right, thank you so much. You've saved your time for rebuttal. Mr. Good? Good morning. Initially, let me thank the Court for its earlier courtesies in continuing this hearing several months ago due to my personal family issue, and I thank the Court for its courtesies. Judge Gordon and Judge Rosenbaum asked the salient points in the issues, and I'd like to answer them, if I may, initially. Is there anything in the record? And the answer is absolutely yes. It is the deposition of Jeff Seglum from Vanguard, who is the – F-E-G-L-E-M. It was a videotaped deposition taken on December 15, 2016. It was filed with the district court. It was made part of our motion for summary judgment. It is in the record. Is it there in transcript form or just video form? I believe it's in transcript form. What page is the – what are the relevant pages? Let me hold them for you. The Court will be in just a moment. One of the items would be page 87. One page would be page 82. One page would be page 68 and 67, 66, 45, 43, 21, and 14. The question is, was the rider issued at the time of contract? Mr. Seglum says yes, it was issued at the time of contract. The question was, was there any separate consideration? Mr. Seglum says no, that inasmuch as after the receipt of the 1035 exchange and the immediate annuitization that there were no charges, costs, or fees placed on this policy and the contract immediately went into annuitization and therefore no fees and charges, as he testified, were assessed to this contract. Additionally, there were fees, right, because the insurance company is earning something to monitor and administer the annuity, right? Vanguard earns fees from administering the contract. It would be taken out prior to annuitization, but it would appear, based upon Mr. Seglum's testimony, that there were no charges at that point in time because of the immediate annuitization. Now, what do you think the rider means? I believe that the rider means that prior to the death of the annuitant, I'm sorry, prior to the annuitant exercising the election of an annuity date to annuitize the contract, that if, in fact, they don't get the opportunity to exercise the annuity, that they would receive the benefit as a death benefit prior to annuitization. I believe the district court had it correct when it looked at the language of the annuitant's death after annuity date. That's what the district court hung its, at least in part, indicating. So if she had passed away before, between the election date, but the date before the payments began, the rider would kick in? I don't believe that to be a correct statement. Then I think prior to the election. Once the election happens, it becomes irrevocable, and that's in Mr. Seglum's testimony. It's in the letter too, right? It is also in the letter of March 18, 2014. When does she elect annuitization compared to when she purchased the contract? It was within weeks. It was within weeks. It was probably less than 30 days. So the rider, in your opinion, kicks in only during those several weeks? Not only is it my opinion, but it is the policy and the practice of the contract as was testified to by Mr. Seglum, that the rider itself is only effective during the accumulation phase, which is just prior to the annuitization, and therefore it would have been a short window with no fees, no charges assessed because of the immediate annuitization. If that's the case, why is a rider necessary? Why doesn't the language of the contract cover that scenario already? I cannot tell you what the genesis of it was, but it was an enhancement to a contract that was there for the benefit of the individual as an added benefit prior to annuitization. I think it was just a marketplace competition. But the date of annuitization and the fact of the annuitization are the important issues in this case. And the fact that the record does reflect in response to a direct question which was sent by this court was, was there a charge and the answer is unequivocally, no. There was no charge. It was issued at the time. It does not, sir, and let me explain to you. It is not an investment once an annuitization, the way an annuity works is once an annuitization occurs, it is irrevocable. And what happened in this instance, the way the law works, the way contracts work, is the accumulation phase then pays over to the annuitization. And Mr. Seglum, in his testimony and in the record, the court will see because I cited to this page, there is no longer an underlying contract. And not only do we have evidence in the record from the deposition of Mr. Seglum, exhibits to the testimony, there were in fact testimony given by Mr. Seglum that the Vanguard records demonstrate that not only did Mrs. O'Brien know that the underlying contract would become void, that the money then gets transferred to the life insurance company, in this case, Transamerica, and that there is no longer a contract, that there is now a payment stream, a lifetime, a 10-year guarantee payment stream, but no underlying value to the contract and no accumulated cash value. That is in Mr. Seglum. He goes through, under my questioning, how the process works. There is certainly no question, based upon the evidence in this case, based upon the letters, based upon the notations of phone calls with Mrs. O'Brien, not the least of which a 2006 letter forwarded to Mr. O'Brien, who is the beneficiary in claiming this million-dollar benefit, explaining how, in fact, the process worked. If, in fact, there was a 2006, and I would point out that the district court judge dropped a footnote about the 2006 because one of the issues that we at least began to talk about at the underlying is that there's probably a statute of limitations defense to this because he was aware of it in 2006, and the district court judge says at the time he became aware of it, he did nothing about it. So the answer is there is no cash accumulation. It was stripped out. There is no money that belongs to Mrs. O'Brien at the time, and that the accumulation phase is separate and apart from the annuitization phase. Can I ask you a question just to make sure I understand the economics of all of this? Well, you may have the wrong guy, but I'll try. Okay, well, I'm trying to figure out whether to buy one of these in the future or not. After hearing, I'll give you my opinion. Okay. As you said, the money that Mrs. O'Brien paid in once she makes the election. Paid in before the election. Right, right, the money she pays for the contract. Yes, sir. Right, the $1.8 million, whatever it was. She pays that in. Before she makes the election, that is supposed to be an investment account that is supposed to accumulate value over time or lose money over time. Fair statement. Depending on the investment decision. Fair statement. Once she elects to have an annuity, that money gets stripped out, as you put it, of the investment account. Correct. This is what I think, but you're going to tell me if I'm right or wrong. The way the economics of the industry work is that now the insurance company and Mrs. O'Brien are each making bets. Mrs. O'Brien is making a bet that she is going to live for a fair amount of time so that either if she dies before the 10-year period is over, her heirs will get whatever payment stream was not made. Correct. And if she lives over the 10-year period sufficiently, she will have made more money than she put in when she brought the contract. Correct. The insurance company is betting that it's going to be smart enough to invest that money for itself to be able to satisfy the income stream for the annuity over the lifetime that Mrs. O'Brien is going to have. And if it invests wisely, it or some subsidiary or some agent will make some money somewhere because if out of those $1.8 million, the market went haywire and Transamerica invested wisely and ended up with $3 million but only paid $2.2 million to her, there's $800,000 left. And that's not going to Mrs. O'Brien because she outlived the annuity perspective. Do I have it right? Not necessarily, and let me explain to you why. Okay. Mrs. O'Brien had two election choices. One is a fixed payment stream where perhaps for that $1.8 million, they would pay her, and I'm just going to pick a number, send her $10,000 a month. Fixed. She'd get $10,000 in January, February, March, April, May, all the way through for that 10 years and with her good fortune, another four or five years thereafter. Or Mrs. O'Brien could, notwithstanding the fact there was no cash, but the money was over at Transamerica and it was their money. It was given to them by virtue of the contract. She would have a right, and that's kind of what Mr. Giesel was referring to without understanding how the process worked. It was, in fact, directed by not only Mrs. O'Brien but by Mr. O'Brien at another time on behalf of his mother that they chose, Mrs. O'Brien chose to perhaps have a variable amount of money available. She was willing to gamble as to how much money she might get out of those annuity units. When you annuitize, cash is transferred and there is some actuarial table that, when you talk about the economics, I cannot even begin to imagine what it is, that converts the cash to annuity units. And in that regard, Mrs. O'Brien said, I think I'm pretty shrewd, and I'd like the potential benefit of risking what the annuity units are valued at. So she directed the income investments that lead to those annuity units. It's a mathematical formula that is not really relevant to this case. And every month, if you look at the accounting, her income was a little bit like this. Perhaps she tracked the market, perhaps she outperformed the market, perhaps she underperformed the market. She didn't take a fixed amount. She did not. But still, the underlying legal principle of the contract is and was that no fees were assessed. The contract, and I heard you, Your Honor, talk about reading the contract together. You must read a contract together. And, in fact, that's exactly how the federal district court rated it and found it to be unambiguous and clear that there were no additional benefits to it. Okay, Mr. Goode, thank you very much. Thank you for your time. Appreciate it. And, again, thank you for your courtesies. Thank you. Your Honor, the last issue that they brought up was once the contract was annuitized, it no longer had any underlying contract value. That was a letter that was sent to Mr. O'Brien from Vanguard. That statement is false. If you read the contract, it's completely false. Benefits under this contract are on a variable basis. They're based on investment experience of a separate account and are not guaranteed as to amount. So we know that this could be zero or this could be $19,000. That's on document 48-2, page ID 428. The separate account that they defined has subaccounts. Well, but Mr. Goode says that what she was really banking on were those sort of annuitization units as opposed to the value of the entire underlying account. That is correct. Is he right or is he wrong about that? He's right about that. Okay. That's why you go with a variable annuity instead of a straight annuity. But then that means that it's not that the account as a whole has accumulated value. It's that the units you're annuitizing, if that's the right term, can change over time. Yes, Your Honor, and the account holder has the right to change the allocations after the term which is never defined anywhere, annuitization, of the contract. They can change and say, well, I no longer want 40 percent, let's say, in government bonds. I want to move that to 60 percent. I want to, by decreasing my stock market exposure. You're allowed to do that under the terms of this contract. And, in fact, it was done. The letters are in the record. So they're keeping track of how much money is there because they have to make that monthly annuity payment. I guess the question is whether or not it's now her money or it's in a pot from which the annuity is drawn. You think that it's her money to be given to her son after she passes. It's in a pot to be drawn. Whatever's left over when she passes under the terms of the death benefit writer would revert to the beneficiary, which in this case was her son. Another thing that Mr. Goode brought up was he wants you to rely on the policy and practice the contract is testified to by Mr. Segelman of Vanguard. Well, first of all, that runs afoul of Ohio law,  but even if you do that, this is what you have to know about Mr. Segelman. Segelman says there's no place in the contract that says you only collect the death benefit if the annuity dies before the contract is annuitized. That's on page 246 of his definition. Segelman says he can't say what the death benefit writer was to replace. Again, same page, ID 246, which is page 18. Annuitization is not defined in the contract. The contract doesn't define the accumulation stage. It does not define annuitization at the last stage. Those are all things that are not defined here. Our final position, Your Honor, if I may, is that you should read this in bar materian. If you do, what you'll find out is there's an annuity contract here and there's a death benefit contract. That's under the terms of that death benefit writer. The annuity streamed from Mrs. O'Brien upon her death, based on whatever is greater, using the insurance company's terms, you can get the accumulated value or you can get the value less than. I see my time is up. Thank you. All right, thank you both very much, and we're in recess for the week. Thank you. Yes. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Welcome to the      Fall Conference General Session.